**UNITED STATES of America for the Use of E. A. WHITE d/b/a E. A. White Co., Appellants,**

v.

**THOMPSON & GEORGESON, INC., an Oregon corporation, and General Insurance Company of America, a Washington corporation, Appellees.**

**No. 19770.**

United States Court of Appeals
Ninth Circuit.

June 2, 1965.

Paul R. Cressman, William L. Hintze, Douglas R. Hartwich, Seattle, Wash., for appellants.

Lewis K. Scott, Koerner, Young, McColloch & Dezendorf, Portland, Or., for appellees.

Before CHAMBERS, Circuit Judge, MADDEN, Judge of the Court of Claims, and KOELSCH, Circuit Judge.

MADDEN, Judge.

Appellee Thompson & Georgeson, Inc., hereinafter called T&G, was the prime contractor with the United States Army Corps of Engineers for the construction of a Ground-Air-Transmitter-Receiver facility in Oregon. The project consisted principally of a building and a two mile access road. T&G subcontracted the building of the road, except for the oiling of its surface, to D. V. Construction Co., hereinafter called Dunbar.

The subcontract with Dunbar provided, inter alia:

All work will be in strict compliance with the Plans, Specifications, General and Special Conditions, and Addenda 1 through 4, and to the complete satisfaction of the Corps of Engineers.

It further provided that Dunbar would be responsible for the subcontract work "until final acceptance thereof," and that

No certificate issued or progress payment made under the Subcontract shall be considered an acceptance of any work, the entire work being subject to final inspection and approval by the owner, architect and contractor when and as provided for in the general contract documents.

Dunbar commenced work in the fall of 1960. By November Dunbar's job creditors had submitted to T&G claims which exceeded Dunbar's earnings at that time. T&G wrote Dunbar pointing out the provision in Dunbar's sub-contract authorizing T&G to demand either paid-in-full invoices or the withholding of funds by T&G from Dunbar's earnings to pay Dunbar's bills.

The appellant White was the largest creditor of Dunbar. He had rented equipment to Dunbar and supplied other items for the job. T&G advised White in detail as to Dunbar's financial status with T&G. White was anxious to keep Dunbar working on the subcontract because Dunbar owed White $1590 from a former job, and because White was in doubt as to whether his claims on this job were fully covered by the Miller Act and T&G's bond given pursuant to that Act. White therefore desired to enter into agreements with T&G and with Dunbar to protect White's interests.

On December 30, 1960, two agreements were executed. One was between White and Dunbar. In it, Dunbar assigned to White

all sums due and to become due from [T&G] by reason of past performance

and future performance of the subcontract * * *.

That agreement further provided that White would first apply the Dunbar funds which he would receive from T&G to the payment of bills incurred by Dunbar on the job, and then to amounts owed White by Dunbar. White further agreed to pay to each of the two Dunbars $300 per month for living expenses while they were performing the subcontract.

The other agreement, also executed on December 30, 1960, was between White and T&G. In it T&G agreed to recognize the assignment which Dunbar had made to White and to pay immediately to White the sum of $7,050.44. This sum was the amount which Dunbar had earned, according to its progress schedule, but had not been paid. In this contract White further agreed to become responsible for a list of Dunbar's existing liabilities on the subcontract as of December 22, 1960, and to pay these liabilities within a reasonable time; and

> to be responsible for the labor and materials and equipment rental to be incurred in the future in connection with the aforesaid subcontract and to discharge the same, and to hold general contractor harmless from any such charges and if the general contractor is required to pay any such charges to reimburse said general contractor for same * * *

The White-Dunbar agreement contained a termination provision, which provision was referred to in the White-T&G agreement. It permitted White, upon any default on the part of Dunbar, and upon two days' notice to Dunbar and to T&G, to terminate the arrangements made in the agreements, and said that White

> thereafter shall not be liable for any labor or materials or equipment rental performed subsequent to the date of such notice.

After the two agreements of December 30, 1960, T&G paid White the $7,050.44 specified in the White-T&G agreement and all amounts thereafter becoming due to Dunbar under the subcontract, as performance by Dunbar continued. On June 14, 1961, Dunbar told T&G's superintendent that the road was ready for oiling. T&G, and not Dunbar, was to oil the road. Dunbar did not claim that its subcontract was completed. There were remaining items which could be done after oiling as well as before. T&G oiled the road on June 16 to 20.

On June 20, 1961, Dunbar abandoned the job. About June 22, T&G began to complete the work included in Dunbar's subcontract but not completed by Dunbar. On June 27, 1961, the Government conducted a "pre-final inspection" of T&G's contract. It accepted the building but rejected the road because it did not comply with the plans and specifications in that (1) the shoulders required more widening, (2) turnouts required lengthening, (3) the grade required raising in certain areas adjacent to a concrete duct line, (4) culverts needed cleaning out and riprapping and, (5) there was brush to be burned. After Dunbar abandoned the job on June 20, T&G had requested White to come to the job to review the problem but White had not done so. After the Government's inspection of the road, T&G's foreman and superintendent checked the items criticized by the Government and found the criticisms justified. T&G corrected the defects, at a cost to it of $9,850.75, and the Government accepted the road on August 6, 1961.

On June 28, 1961, White gave T&G written notice of termination of White's liability under the December 30, 1960, agreement.

When the Government accepted the road on August 6, there remained unpaid bills of Dunbar, incurred on the job, amounting to $12,714.99, some of which had been on the list of bills which White had agreed, on December 30, 1960, to pay "in a reasonable time," and all of which had been incurred by Dunbar before the abandonment of the job on June 20, 1961, and before White's notice of termination of liability. T&G assembled all the data connected with the Dunbar subcontract, sent them to White, and demanded that he pay the unpaid bills. White did not

pay them. T&G negotiated settlements releasing it from liability for the $12,-714.99 of Dunbar's unpaid bills. T&G paid Dunbar's creditors $4,708.09 for those releases, and its costs in securing them were $1,546.34, a total expense of $6,254.43.

The total amount which would have been payable to Dunbar if the contract had been performed to comply with Government specifications and if Dunbar had paid its own bills would have been $37,-011.98. T&G had paid to Dunbar or to White as Dunbar's assignee $22,818.01. It had paid $9,850.75 to complete Dunbar's unfinished subcontract work. That left in T&G's hands subcontract funds of $4,343.22. But T&G had expended $6,-254.43 in settling Dunbar's unpaid bills of $12,714.99. The difference between the $4,343.22 of contract funds and the $6,-254.43 expended to settle Dunbar's contract debts is $1,911.21.

Although White's suit against T&G was started on a different theory, its posture in this appeal is that White is claiming under his assignment from Dunbar, the difference between Dunbar's subcontract price of $37,011.98 and the amount, $22,818.01, which T&G has paid to Dunbar and to White as Dunbar's assignee, less a certain credit which White concedes to T&G. The amount claimed by White is $12,734.98. T&G's position is that neither $12,734.98 nor any other amount is owing to Dunbar, or to White as Dunbar's assignee, but that, on the contrary, the amount which T&G would have owed Dunbar, or White as Dunbar's assignee, has been more than exhausted by what T&G has spent in completing Dunbar's work and settling his unpaid bills, there being a deficit of $1,911.21 in that regard. T&G's computation of the account has been recited earlier in this opinion.

White asserts (1) that Dunbar had substantially completed its subcontract and that therefore the balance of the contract price was nearly all earned and was due to White as Dunbar's assignee; (2) that White is not liable for the expenditures made by T&G to complete Dunbar's

work and pay Dunbar's unpaid bills because those expenditures were made after White had given notice of the termination of its liability for Dunbar's debts.

As to White's first point, Dunbar had, in its subcontract with T&G, agreed that

All work will be in strict compliance with the Plans, Specifications, General and Special Conditions, and Addenda 1 through 4, and to the complete satisfaction of the Corps of Engineers.

The Corps of Engineers required T&G to do the additional work. What that work was and how much it reasonably cost was the subject of conflicting evidence in the trial in the District Court. That court found the cost to have been $9,850.75 and we will not disturb that finding. Dunbar's contract with T&G contained the usual provision allowing the contractor, in case of the subcontractor's default, to take over and complete the work at the subcontractor's expense. White urges that when T&G proceeded to oil the road, it accepted Dunbar's performance as complete and thereby waived any right to demand completion by Dunbar. The District Court did not find any such intention on the part of T&G and Dunbar, and we agree that no such intention was shown.

As to the $6,254.43 which T&G charged against Dunbar on account of the settlement of claims made by Dunbar's creditors against T&G, Dunbar, in its subcontract with T&G, had agreed, in a "hold harmless" paragraph, that if claims were made by Dunbar's job creditors for which T&G might be held liable, then T&G

may retain out of the moneys due or to become due [Dunbar] an amount sufficient to indemnify against liability or loss by reason of such lien or claim, including the cost of litigation, and attorney fees * * *.

The claims filed by Dunbar's job creditors on account of Dunbar's activities before it abandoned the job amounted, as we have seen, to $12,714.99. T&G succeeded in obtaining releases of its liability or potential liability on these claims by

paying the creditors only $4,708.09. But the attorney fees and the reasonable value of the time spent by T&G's personnel in obtaining these settlements amounted to $1,546.34. The total of $6,254.43 was, under Dunbar's contract with T&G quoted above, properly chargeable to Dunbar.

The items discussed above being properly chargeable to Dunbar, and amounting to more than enough to exhaust the remainder of Dunbar's contract price, what is the status of White? White's point (2) stated above, that these expenditures charged by T&G against Dunbar were made after White had given notice of termination of his liability for claims against Dunbar accruing in the future, would seem to be irrelevant. White is suing as the assignee of Dunbar, and as such he stands in Dunbar's shoes. The assignment, and T&G's contemporaneous consent to the assignment, and the circumstances of it, contain no intimation that White was to get the contract money from T&G without offsets arising out of accounts between Dunbar the assignor and T&G. Cases cited by White, such as Nello L. Teer Co. v. Kanawha Valley Bank, CA 4, 227 F.2d 306, in which the assignment was found by the court to be immune from offset, are not in point.

White then, as assignee of Dunbar, cannot recover anything from T&G because T&G does not owe anything to Dunbar.

The District Court awarded T&G a judgment for $1,911.21 against White, on T&G's counterclaim against him. Merely as assignee one does not become affirmatively liable for a deficit in the accounts between his assignor and the other party to the assigned contract. Any such liability would have to be based upon an affirmative assumption, by the assignee, of the obligations of his assignor on the contract, or upon some independent contractual arrangement.

In the instant case White, in his December 30, 1960, agreement with T&G, which was contemporaneous with his assignment from Dunbar, agreed to be responsible for the labor and materials and equipment rental to be incurred in the future in connection with the aforesaid subcontract [Dunbar's subcontract] and to discharge the same, and to hold the general contractor [T&G] harmless from any such charges and if the general contractor is required to pay any such charges to reimburse said general contractor for same * * *

The judgment in favor of T&G and against White for $1,911.21 was rendered, not against White as assignee of Dunbar, but against White as surety for Dunbar, pursuant to the hold harmless agreement quoted above. Whether or not the hold harmless agreement would apply to the $9,850.75 which T&G expended to complete Dunbar's work, we do not decide. Whether or not it would apply to the $1,546.34 of expenses which T&G incurred in securing releases of itself from liability on $12,714.99 of Dunbar's job debts we do not decide. As to the $4,708.09 which T&G paid those creditors for their releases, White's hold harmless obligation did apply. White's argument that these payments were made after he had terminated his liability agreement has no merit. The debts had been incurred by Dunbar before White's termination, and his agreement with T&G covered them. But T&G is short only $1,911.21 of being paid in full in its accounts with Dunbar, so that is the extent of White's liability to T&G on White's hold harmless agreement.

White urges that T&G has paid itself in full for the $4,708.09 which it paid out to settle Dunbar's debts, and that if there is a shortage of Dunbar's accounts with T&G it is not on account of that item. We are therefore faced with a problem of marshalling. T&G had in its hands $14,193.97 which it would have had to pay to Dunbar if Dunbar had completed its contract and paid its own debts. T&G says it has used the money by paying itself $9,850.75 for the costs of completing the Dunbar subcontract, $1,546.34 for the cost of obtaining the releases, and has applied the balance in its hands some

$2,808.66, as far as it will go, to reimburse itself for the $4,708.09 which it paid to Dunbar's creditors to secure their releases from claims against it, T&G, on account of their claims against Dunbar. But the amount of Dunbar's money still in T&G's hands was not sufficient to reimburse T&G for the entire $4,708.09, but left T&G short by $1,911.21, the amount for which the District Court rendered the judgment for T&G on its counterclaim against White.[1]

We think T&G was within its rights in applying the money in its hands as it did. So far as that money would reach, T&G was, to use the phrase of Justice Jackson in the United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022, "the best secured of creditors." But that security fell short by $1,911.21 of making T&G whole on the Dunbar account. White had agreed with T&G to hold T&G harmless against claims against T&G by Dunbar's creditors. That agreement clearly applied to the Dunbar debts of $12,714.99 from which T&G secured releases by paying $4,708.-09. Was T&G under any obligation to White to reimburse itself fully for this $4,708.09 out of the Dunbar funds which it had withheld, thus relieving White of any obligation on his hold harmless agreement with T&G, but leaving T&G short by $1,911.21 in its account with Dunbar?

The Restatement, Security, § 142, says:

Where the creditor has claims against the principal other than that upon which the surety is bound, payments to the creditor are applied according to the following rules:

\* \* \* \* \* \*

(e) Where neither the principal nor the creditor seasonably manifests an intention as to the application of a payment, the payment is applied in the way most favorable to the creditor, unless under the circumstances such an application would violate a right of the surety, the principal, or another to a more equitable application.

In Comment to clause (e) appears this statement:

g. The rule stated in this Clause is substantially that stated in the Restatement of Contracts § 387(c) as applied in § 394.

In the instant case Dunbar had manifested no intention as to how the money withheld from it should be applied. We find in the circumstances no equity which would require a departure from the stated rule.

The judgment of the District Court is affirmed.

1. There is a discrepancy of some $10 in the computation of this balance which we do not attempt to resolve.